IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RICHARD S. MARTIGNETTI, | * | |
| Plaintiff, | * | |
| | | Civil Action No. RDB-18-2431 |
| v. | * | |
| INTERNATIONAL BUSINESS MACHINES, INC. | * | |
| | * | |
| Defendant. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

Plaintiff Richard S. Martignetti ("Plaintiff" or "Martignetti") alleges that his former employer, Defendant International Business Machines Corporation ("Defendant" or "IBM"), unlawfully capped his commissions on sales of IBM products despite IBM's representation that his commissions were potentially limitless. Martignetti's Amended Complaint (ECF No. 12) brings four counts, as follows: a claim arising from the alleged violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501, *et seq.* (Count I); fraud (Count II); negligent misrepresentation (Count III); and unjust enrichment (Count IV).

Now pending is Defendant IBM's Motion to Dismiss (ECF No. 14). The Incentive Plan Letter issued by IBM to Martignetti indicates that IBM retained broad discretion to modify or cancel commission payments for any individual. (Am. Compl. Ex. B, ECF No. 12-3.) This disclaimer vitiates Martignetti's claims under the MWPCL and the common law. Accordingly, Defendant IBM's Motion to Dismiss (ECF No. 14) is GRANTED. This action is DISMISSED WITH PREJUDICE in its entirety.

## BACKGROUND

In ruling on a motion to dismiss, the factual allegations in the plaintiff's complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). This Court may also consider documents attached to a motion to dismiss so long as they are "integral to the complaint and authentic." *Thompson v. United States*, RDB-15-2181, 2016 WL 2649931, at *2 n.4 (D. Md. May 10, 2016), *aff'd* 670 F. App'x 781 (4th Cir. 2016) (citations omitted). Martignetti worked for IBM between 2005 and June 2018 as a commissioned salesperson and a sales manager. (Am. Compl. ¶ 7, ECF No. 12.) While employed at IBM, Martignetti earned a base salary and additional incentive compensation in the form of a commission or bonus. (*Id.* at ¶ 8.) In this lawsuit, Martignetti alleges that IBM failed to pay him in accordance with an incentive plan effective as of January 1, 2017.

### I. The Commission Plan.

In January 2017, IBM assigned Martignetti to sell IBM's "Software as a Service" ("SaaS") products and services. (*Id.* at ¶ 12.) For this project, Martignetti managed and supported a team of seven salespeople. (*Id.* at ¶ 13.) The commission structure for SaaS sales were set forth in a six-month commission plan effective January 1, 2017 ("the Plan"). (*Id.* at ¶ 14.) The Plan was described in a PowerPoint presentation titled "Your 2017 Incentive Plan." (Am. Compl. Ex. A, ECF No. 12-2.)

The PowerPoint detailed how commissions were to be made. Under the Plan, Martignetti received commissions at a lower rate until he sold enough products and services

to meet an assigned sales quota. (*Id.* at ¶ 15.) IBM assigned Martignetti a sales quota of $5,019,158.00 and a "Target Incentive" of $77,878.00. (*Id.* at ¶ 17.) For each 1% of the quota up to 100%, Martignetti earned 1% of his Target Incentive. (*Id.* at ¶ 18.) For each 1% of the quota between 100% and 200% of the $5,019,158.00, he earned 3% of his Target Incentive. (*Id.* at ¶ 19.) For each 1% of quota above 200%, he earned 2% of his Target Incentive. (*Id.* at ¶ 20.) For purposes of the plan, Martignetti fell into a category of employees referred to as "Software Solution sellers without dedicated XaaS element." (*Id.* at ¶ 24.) The PowerPoint slide describing the plan terms applicable to this group indicated that "earnings opportunity is uncapped." (*Id.* at ¶¶ 25-26.) In other words, Martignetti could earn a potentially unlimited amount of commissions. (*Id.* at ¶ 26.)

In connection with the commission plan, Martignetti was asked to sign an Incentive Plan Letter ("IPL") dated May 25, 2017. (*Id.* at ¶ 14; Am. Compl. Ex. B, ECF No. 12-3.) The IPL contained a number of disclaimers which reserved IBM's right to modify payments under the Plan, modify the Plan terms, or cancel it entirely. These provisions are set forth in the IPL as follows:

> **Right to Modify or Cancel**: The Plan does not constitute an express or implied contract or promise by IBM to make any distributions under it. IBM reserves the right to adjust the Plan terms, including, but not limited to, changes to sales performance objectives, assigned territories or account opportunities, applicable incentive payment rates or similar earnings opportunities, or to modify or cancel the Plan, for any individual or group of individuals, including withdrawing your accepted Incentive Plan Letter if your incentive eligibility status changes.

(*Id.* at ¶ 29.)

3

The IPL contained a provision which reserved IBM's right to adjust incentive payments associated with certain transactions:

> **Review of a Specific Transaction**: If a specific customer transaction has a disproportionate effect on an incentive payment when compared with the opportunity anticipated during account planning and used for the setting of sales objectives, or is disproportionate compared with your performance contribution towards the transaction, IBM reserves the right to review and, in its sole discretion, adjust the incentive achievement and/or related payments.

(*Id.* at ¶ 32.)

Another provision made clear that IBM could adjust payments based on its review for errors:

> **Adjustments for Errors**: IBM reserves the right to review and, in its sole discretion, adjust or require repayment of incorrect incentive payments resulting from incomplete incentives processes or other errors in the measurement of achievement or the calculation of payments, including errors in the creation or communication of sales objectives. Depending on when an error is identified, corrections may be made before or after the last day of the full-Plan period, and before or after the affected payment has been released.

(*Id.* at ¶ 31.)

Finally, the IPL explained when incentive payments are earned under the plan:

> **Earnings**: Incentive payments you may receive for Plan-to-Date achievement are a form of advance payment based on incomplete business results. Your incentive payments are earned under the Plan terms, and are no longer considered Plan-to-Date advance payments, only after the measurement of complete business results following the end of the full-Plan period. (Or, if applicable, after the date you left the Incentive Plan early.) Incentive payments will be considered earned only if you have met all payment requirements, including: (1) you have complied with the Incentive Plan; (2) you have not engaged in any fraud, misrepresentation or other inappropriate conduct relating to any of your business transactions or incentives; and (3) the customer has paid the billing for the sales or services transaction related to your incentive achievement.

(*Id.* at ¶ 30.)

## II. Plaintiffs' Sales and Compensation under the Plan.

Martignetti alleges that he vastly exceeded IBM's quota. Between January 1, 2017 and June 30, 2017, Martignetti was allegedly responsible for selling $34,759,088.00 in SaaS products and services, a figure which equates to 692.53% of his $5,019,158.00 quota. (*Id.* at ¶¶ 38-40.) Martignetti contends that this resulted in him earning $928,543.00 in commissions. (*Id.* at ¶ 41.) Between July 2017 and September 2017, IBM allegedly reviewed Martignetti's sales and ultimately concluded that his sales were legitimate and commissionable. (*Id.* at ¶¶ 42-43.) In September 2017, Martignetti inquired of an IBM incentives analyst about the status of $23,191,631.48 in orders. (*Id.* at ¶ 45.) The analyst assured him that this money would count toward his commission and that he was due $928,802.43 in commissions. (*Id.* at ¶¶ 45-46.)

IBM allegedly failed to pay Martignetti the entire amount to which he was entitled under the Plan terms. The company allegedly terminated one or more employees for failing to realize that Martignetti, his team, and other teams, could earn hefty commissions under the Plan. (*Id.* at ¶ 53.) Between April 2017 and September 2017, IBM paid Martignetti some portion of his commissions. (*Id.* at ¶ 54.) In September 2017, however, IBM "capped" Martignetti at 300% of his quota achievement. (*Id.* at ¶ 55.) Plaintiff alleges that this action is the equivalent of "taking back" $526,000.00 in commissions. (*Id.* at ¶ 56.)

Martignetti did not receive a detailed explanation for this action. An IBM incentive analyst, Tania Costa de Magalhaes, informed him that his first line manager, Chris Zobler, had made a statement about Martignetti's "relative performance v. personal impact for the business." (*Id.* at ¶ 59.) When confronted, Zobler did not provide any rationale for the alleged underpayment. (*Id.* at ¶ 61.) Martignetti alleges that the explanation he received from Ms.

5

Magalhaes was a "complete fabrication" and "simply a pretext" for reducing his earnings. (*Id.* at ¶ 62.)

### III. Procedural Background.

Martignetti commenced this action on August 9, 2018 and asserted a single claim for violation of the Maryland Wage Payment and Collection Law ("MWPCL"). On September 18, 2018, IBM moved to dismiss the Complaint (ECF No. 8.) On October 16, 2018, Martignetti filed a First Amended Complaint (ECF No. 12), which asserts four claims: a violation of the MWPCL (Count I); fraud (Count II); negligent misrepresentation (Count III); and unjust enrichment (Count IV). IBM moved to dismiss on October 29, 2018. (ECF No. 14.)

## STANDARD OF REVIEW

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). In *Twombly*, the Supreme Court articulated "[t]wo working

6

principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678. First, while a Court must accept as true all the factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim). Second, a Complaint must be dismissed if it does not allege a "plausible" claim for relief. *Id.* at 678-79 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct allege.").

In reviewing a Motion to Dismiss, this Court "may properly take judicial notice of matters of public record . . . [and] consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004), Accordingly, this Court takes judicial notice of the Exhibits attached to the Amended Complaint.

**ANALYSIS**

All of Plaintiff's claims are premised on his allegation that IBM made a promise to pay him a certain amount in commissions, but failed to uphold that promise. The IPL, however, clearly indicated that "[t]he Plan does not constitute an express or implied contract or promise by IBM to make any distributions under it." (ECF No. 12-2 at 2.) IBM retained absolute discretion to modify the Plan, review and adjust payments, or cancel the Plan entirely. (*Id.*) Under these conditions, IBM's alleged failure to pay the full commissions allegedly owed to

7

Martignetti does not violate Maryland law. For this reason, Plaintiff's claims are DISMISSED WITH PREJUDICE.

**I. Plaintiff Fails to State a Claim for a Violation of the Maryland Wage Payment and Collection Law (Count I).**

In Count I, Martignetti alleges that IBM violated the Maryland Wage Payment and Collection Law ("MWPCL") by failing to pay the commission it owed him under the Plan. Specifically, Martignetti alleges that the commissions under the Plan constitute wages to which he is entitled under the MWPCL. (Am. Compl. ¶¶ 82-88.) Martignetti alleges that IBM is withholding his wages in bad faith and seeks treble damages. (*Id.* at ¶¶ 88-91.)

The MWPCL creates a private right of action for unpaid, earned wages. Md. Code Ann., Lab. & Empl. § 3-507.2. The law requires that:

> Each employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated.
>
> Lab. & Empl. § 3-505.

The term "wages" is defined in the statute to include commissions, bonuses, fringe benefits, and "any other remuneration promised for service." Lab. & Empl. § 3-501(c).

Only benefits which are promised to the employee constitute wages under the MWPCL. In *Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 783 A.2d 667 (2001), the Maryland Court of Appeals considered "whether a bonus payment that is not a part of the compensation promised and agreed to be paid an employee, but that has been recommended and approved for payment, yet not delivered to the employee before the employee voluntarily

terminated employment, is a wage under the [MWPCL]." *Id.* at 298, 783 A.2d 667. Examining the definition of "wages" set forth in § 3-501(c), the Court of Appeals concluded that the forms of remuneration listed (including commissions), must have in fact been "promised for service" to constitute wages under the law. *Id.* at 304-05. The Court applied this "bright line test" and determined that a bonus offer made to the respondent-employee which fell outside of his compensation package did not constitute "wages." *Id.* at 305-06.

Applying the "bright line test" described in *Whiting-Turner*, this Court has held that revocable incentive plans cannot support an MWPCL claim. For example, in *Willis v. Stanley Black & Decker, Inc.*, DKC-12-1991, 2012 WL 6019364 (D. Md. Nov. 30, 2012), this Court considered an MWPCL claim arising from the alleged breach of a Management Incentive Compensation Plan (the "compensation plan"). The compensation plan specified that the "Board of Directors . . . may at any time elect to amend, suspend, or terminate the plan." *Id.* at *2. Reiterating the holding of *Whiting-Turner*, this Court noted that the dispositive issue was "whether an employee is *entitled* to a non-discretionary bonus at the time of his termination based on a contractual obligation or binding promise undertaken by his employer." *Id.* at *5. This Court held that the failure to pay bonuses under the compensation plan did not give rise to a claim under the MWPCL because the Board of Directors maintained the ability to amend, suspend or terminate it. *Id.* at *5. As any payment under the plan was rendered discretionary by this language, the bonuses under the compensation plan did not constitute wages under Maryland law. *Id.*; *see also Windesheim v. Verizon Network Integration Corp.*, 212 F. Supp. 2d 456, 463 (D. Md. 2002) (dismissing MWPCL claim based on unpaid bonus because the employer retained the "unlimited discretion . . . to reduce, modify, recover or withhold incentive pay

9

pursuant to changes in business conditions, individual performance or any other reason management deems appropriate in their sole discretion").

Finally, numerous courts, including the United States Court of Appeals for the Fourth Circuit, have examined the language appearing in the IBM commission plan at issue in this case and have concluded that these plans do not create an enforceable promise to pay wages. *See, e.g.*, *Jensen v. Int'l Bus. Machs. Corp.*, 454 F.3d 382, 384 (4th Cir. 2006) (affirming district court's grant of summary judgment on plaintiff's breach of contract claim after observing that the IBM Incentive Plan Letter's "Right to Modify or Cancel" clause made clear that the incentive plan was not to be construed as an offer); *see also Wilson v. Int'l Bus. Machs. Corp.*, 610 F. App'x 886, 888-89 (11th Cir. 2015) (dismissing breach of contract claim because "the clear terms of the IPL provide that IBM holds the cards with respect to how sales commissions are calculated"); *Kavitz v. Int'l Bus. Machs. Corp.*, 458 F. App'x 18 (2d Cir. 2012) (holding that IBM did not intend to create an enforceable contract based on similar incentive plan); *Fessler v. Int'l Bus. Machs. Corp.*, Civ. Act. No. 1:18-cv-798, 2018 WL 6220209 (E.D. Va. Nov. 28, 2018) (dismissing breach of contract claim based on IBM's failure to pay commissions because of disclaimers contained in IPL).

In this case, the disclaimers in the May 2017 IPL foreclose any claim that commission payments under the Plan constitute "wages" under the MWPCL. The IPL disclaimers govern "the Plan," which is defined to include materials available on IBM's website, among which is the PowerPoint presentation Plaintiff describes in the Amended Complaint. The IPL explicitly states that the Plan is "not an express or implied . . . promise by IBM to make any distributions under it." (Am. Compl. ¶ 29.) This language alone indicates that the commission

10

payments were not "promised for service" as wages under the MWPCL must be. The absolute discretion granted to IBM bolsters this conclusion. The IPL indicates that IBM had discretion to withhold or modify payments under the Plan. Pursuant to the IPL disclaimers, IBM could "modify or cancel the Plan[] for any individual . . ." and it had "sole discretion" to modify payments based on its assessment that an employee was being compensated in a manner disproportionate to the work he had performed. (*Id.* at ¶ 29, 32.) This wide latitude to modify or withhold payments indicates that the commissions were not "promised" at all.

Martignetti relies on three cases in support of his claim, all of which are distinguishable. Two of these, *Medex v. McCabe*, 372 Md. 28, 811 A.2d 297 (2002), and *Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443 (D. Md. 2015) hold that an employer may not deny earned payments merely because the employee has left the job. In *Medex*, an employee's incentive compensation was conditioned on the attainment of certain productivity goals as well as "being an employee at the end of the incentive plan . . . *and being employed at the time of actual payment.*" *Id.* at 33. McCabe had resigned after the end of the plan period but before payments were disbursed. *Id.* Ultimately, the Court refused to enforce the requirement that McCabe remain employed during the disbursal of wages, holding that wages become due under the MWPCL when the employee "does everything required to earn the wages." *Id.* at 41. The situation in *Hausfeld* was similar. In that case, an employer's compensation plan established a three-year waiting period for the disbursals of commissions. Hausfeld, 131 F. Supp. 3d at 449. When Hausfeld was fired during the waiting period, he was not paid his previously earned commissions even though there was no dispute that he had earned them. *Id.* at 450-51. Relying on *Medex*, this

11

Court determined that Hausfeld's employer could not withhold his wages merely because he was no longer employed. *Id.* at 460-61.

In this case, Martignetti alleges that his commissions were capped despite an alleged promise to the contrary. He does not allege, as in *Medex* or *Hausfeld*, that he was totally denied compensation pursuant to a continuing-employment policy. The issue presented in this case is simply different. Unlike in *Medex* and *Hausfeld*, IBM expressly indicated that its commission plan was not a "promise." *Medex* and *Hausfeld* did not grapple with this language, which vitiates any claim that IBM's commissions were "wages" that must be paid under the MWPCL.

Finally, Martignetti relies on *Vinson v. Int'l Bus. Machs. Corp.*, 1:17-cv-00798, 2018 WL 4608250 (M.D.N.C. Sept. 25, 2018). In *Vinson*, the Middle District of North Carolina analyzed a claim under the North Carolina Wage and Hour Law arising from IBM's alleged withholding of commission payments. The Court dismissed the plaintiff's contract claim because IBM's "Right to Modify or Cancel" provision appearing in the IPL at issue clearly indicated that a contract had not been formed. *Vinson*, 2018 WL 4608250, at *5-6. Nevertheless, the Court denied IBM's motion to dismiss the North Carolina Wage and Hour Law claim, holding that a claim under that provision did not require the existence of an enforceable agreement. *Id.* at *8-9.

In this case, the Maryland Wage Payment and Collection Law governs. Unlike its North Carolina counterpart, the MWPCL requires wage claims to be supported by a binding promise. *See Whiting-Turner*, 366 Md. at 304-05, 783 A.2d 667. Whereas the *Vinson* Court could properly dismiss a breach of contract claim while sustaining a wage claim, the MWPCL

does not permit such a result. The lack of an enforceable promise is decisive under Maryland law. As the terms of the IPL clearly indicate that it does not constitute a "promise" at all, Plaintiff's MWPCL claim (Count I) is DISMISSED WITH PREJUDICE.[1]

## II. Plaintiff Fails to State a Claim of Fraud or Negligent Misrepresentation (Counts II and III).

In Counts II and III, Plaintiff alleges that IBM engaged in fraud and made negligent misrepresentations to him concerning his commission payments. Specifically, Martignetti alleges that IBM made fraudulent and/or negligent misrepresentations when it indicated that commissions were uncapped and that his commission could be earned upon the fulfillment of the conditions enumerated in the "Earnings" paragraph of the IPL. Under Maryland law, fraud has the following elements:

> (1) The defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

*State Construction Corp. v. Slone Assocs., Inc.*, PWG-18-0464, 385 F. Supp. 3d 449, 469 (D. Md. 2019) (quoting *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276, 292 (2005)). Fraud claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

---

[1] Plaintiff additionally relies on deposition testimony from another case captioned *Bobby J. Choplin v. International Business Machines Corporation*, No. 1:16-cv-1412-TDS-JEP (M.D.N.C. filed Dec. 16, 2016). In this testimony, IBM representatives appeared to agree that IBM "had an obligation not to cap" earnings under a 2015 compensation plan. (Am. Compl. Ex. F, 19:6-12, ECF No. 12-7.) The IBM representatives' legal conclusions concerning IBM's obligations to pay commissions are not binding on this Court and do not affect this Court's analysis. *See Vinson*, 2018 WL 4608250, at *2 n.1 (declining to address this same testimony).

13

The elements of negligent misrepresentation are similar. Plaintiff must ultimately prove that (1) the defendant, owing a duty a of care to the plaintiff, negligently asserted a false statement; (2) intending that the statement will be acted on by the plaintiff; (3) with knowledge that the plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) suffers damage proximately caused by the defendant's negligence. *Douglas v. NIT-TSS, Inc.*, 632 F. Supp. 2d 486, 494 (D. Md. 2009) (citing *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534, 539 (Md. 1982)).

IBM seeks dismissal of the fraud claim, arguing that Martignetti (1) has failed to satisfy the particularity requirement under Rule 9(b); (2) cannot show the requisite intent to deceive; and (3) cannot show reasonable reliance. (ECF No. 14-1 at 15-18.) Plaintiff's failure to demonstrate reasonable reliance also forecloses his fraudulent misrepresentation claim, Defendant argues. *See United States Home Corp. v. Settlers Crossing, LLC*, DKC-08-1863, 2012 WL 3536691, at *10 (D. Md. Aug. 14, 2012) (applying the same analysis to the "justifiable reliance" element of both negligent misrepresentation and fraud) (citing *Lavine v. Am. Airlines, Inc.*, ---A.3d---, 2011 WL 6003609, at *5 (Md. Ct. Spec. App. Dec 1, 2011).

This Court focuses its analysis on "justifiable reliance," as both claims rise and fall on Plaintiff's ability to meet this element. In this case, Plaintiff cannot plausibly allege that he justifiably relied on any representations indicating that his earning potential under the Plan was unlimited. The IPL forecloses any such argument because it unambiguously indicates that the Plan does not constitute a promise to make payments, and that it could be canceled at any

14

time. *See Fessler*, 2018 WL 6220209, at *6-7 (dismissing fraudulent misrepresentation claim on the basis that IPL language foreclosed any allegations of justifiable reliance).

Plaintiff's appeal to *Vinson* on this point is once again unavailing. In *Vinson*, the Middle District of North Carolina denied IBM's motion to dismiss Vinson's fraud claims, reasoning that the claim turned on factual questions not suitable for adjudication during the motion to dismiss stage. *Vinson*, 2018 WL 4608250, at *10. In this case, there are no factual questions prohibiting dismissal. The IPL granted IBM broad discretion to modify or cancel the Plan at any time; reliance on any representations to the contrary—including a single bullet point on a PowerPoint slide—was not justifiable. Accordingly, Plaintiff's fraud and negligent misrepresentation claims (Counts II and III) are DISMISSED WITH PREJUDICE.

### III. Plaintiff Fails to State a Claim for Unjust Enrichment (Count IV).

Count IV brings a claim of unjust enrichment. To prevail on a claim of unjust enrichment under Maryland law, Plaintiff must ultimately demonstrate that:

> (1) the defendant conferred a benefit upon the plaintiff; (2) the defendant appreciated or knew of the benefit; and (3) the defendant accepted or retained the benefit 'under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.'

*State Constr. Corp. v. Slone Assocs., Inc.*, 385 F. Supp. 3d 449, 467 (D. Md. 2019) (quoting *Mohiuddin v. Doctors Building & Management Solutions, Inc.*, 196 Md. App. 439, 9 A.3d 859, 865 (Md. Ct. Spec. App. 2010)).

In this case, Plaintiff cannot claim that IBM's acceptance of Martignetti's services was "inequitable." As previously indicated, the IPL expressly indicated that the Plan could be modified or canceled at any time, and that IBM retained complete discretion concerning the

15

disbursal of payments. Although these terms are highly advantageous to IBM, this alone does not render them actionable under an unjust enrichment theory. Martignetti agreed to make sales under these terms; if he found them unacceptable, he was free to raise the issue or seek employment elsewhere. *See Fessler*, 2018 WL 6220209, at *5 (dismissing unjust enrichment claim based on disclaimers in IBM's IPL). Accordingly, Plaintiff's unjust enrichment claim (Count IV) is DISMISSED WITH PREJUDICE.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss (ECF No. 14) is GRANTED. This action is DISMISSED WITH PREJUDICE in its entirety.

A separate Order follows.

Dated: September 30, 2019

_____/s/_____
Richard D. Bennett
United States District Judge